ESTATE OF PAYNE: MARSHALL & ILSLEY BANK, Administrator, Respondent, vs. COMMISSIONERS OF PUBLIC LANDS, Appellants.

*April 4—May 10, 1932.*

For the appellants there was a brief by the *Attorney General* and *J. E. Messerschmidt,* assistant attorney general, and oral argument by *Mr. Messerschmidt.*

For the respondent there was a brief by *Robert R. Freeman,* attorney, and *Henry V. Kane* and *Ernst von Briesen* of counsel, all of Milwaukee, and oral argument by *Mr. Freeman.*

FOWLER, J. Lillian G. Payne died in Milwaukee county intestate and without heirs or distributees. Her estate was administered by the Marshall & Ilsley Bank as special administrator, and the county court in process of administration assigned to the state as an escheat her entire estate consisting of both real and personal property. The personal property so assigned amounted to $12,255.56 and was paid to the state treasurer. Thereafter the trustees of the Milwaukee County Orphans' Board petitioned the court to vacate its order so far as it assigned the personal property and assign such property to them pursuant to ch. 471, P. & L. Laws of 1871, which purports to require the county court of Milwaukee county to order paid to the petitioners the residue of the personal estate of persons dying in that county whose

estates are administered by that court in case no heir appears within one year from the granting of his letters of administration, subject to return and payment to the heir in case one appears within five years. The court granted the petition, and from its order the defendants appeal.

The appellants assign as error that the act on which the order was based violates sec. 2, art. X, of the state constitution, which provides that "all moneys and the clear proceeds of all property that may accrue to the state by forfeiture or escheat . . . shall be set apart as a separate fund to be called 'the school fund.' "

The point turns on whether personal property as well as land "escheats" within the meaning of the word as used in this provision. While the word originally applied only to land it has gradually become extended to include personal property. 11 Am. & Eng. Ency. of Law (2d ed.) 315; 21 Corp. Jur. p. 848; 10 Ruling Case Law, p. 604; 3 Words & Phrases (1st series) 2463. The word was used as including both kinds of property at the time the constitution was adopted in the statutes and decisions of several states. It was so used in New York in an "act concerning escheats" passed in 1792 (*Johnston v. Spicer,* 107 N. Y. 198, 199, 13 N. E. 753). The word was so used in the statutes and decisions of Alabama, South Carolina, Georgia, Tennessee, and Texas. 4 Kent, Comm. (14th ed.) 424, note; *Howard v. Schmidt,* Rich. Eq. Cas. 457 (1831); *White v. Wayne,* T. U. P. Charlt. 97 (1807); *Deaderick v. County Court,* 1 Cold. (Tenn.) 202; *Hill v. Claiborne,* 27 Tex. 217. The Kentucky court construed the word as referring to land only in a statute declaring negroes to be real property but providing that they should not escheat. *Comm. v. Blanton's Ex'rs,* 2 B. Mon. (Ky.) 393. However, we consider that this was contrary to the commonly accepted meaning at the time of the adoption of our constitution. This is borne out

by a statement of Mr. Lincoln in a speech upon the slavery question: "To the high honor of Kentucky, as I am informed, she is the owner of some-slaves by escheat, and has sold none, but has liberated all." Century Dictionary.

In England personal property of persons dying intestate and without heirs became the property of the king from earliest times, and in the states ever since the formation of the Union it became the property of the state, whether the devolution was called an escheat or not. It was manifestly the idea of the framers of the constitution that the personal property of persons so dying should "accrue" to the state, and it was doubtless their idea that the phrase "and all moneys and the clear proceeds of all property" in the section of the constitution involved included personal property as well as land. The debates in the constitutional convention indicate the disposition and intention of that body to throw everything possible into the school fund. The school-fund provision was taken from a like provision of the unratified constitution of 1846, which was referred to in the debates as the one above all others in that constitution worthy of retention. That provision indicates that the word "property" as used in connection with the word "escheat" was intended to include both real and personal property. Sec. 2, art. X, of that constitution provided that there should be a state fund for the support of the common schools throughout the state, the capital of which should remain inviolate. "All moneys, and the *clear proceeds of all property, real or personal,*" that had been or might be granted to the state by the United States, for educational purposes, except that granted for a state university, "and all *moneys* and the *clear proceeds of all property*" which might "accrue to the state by *forfeiture or escheat*" should be appropriated to the capital of the school fund. Plainly the words "all property" as used in connection with the word "escheat" in this provision

was meant to include "all property, real or personal," as it was specifically declared the words included as used in connection with grants from the United States. That the words have this meaning in the provision adopted we have no doubt. The framers of the constitution were chary in the use of words. Why use the words "land" and "personal property" when the word "property" included both? No reason is perceived why one species of property as well as the other should not go into the school fund, or why one as well as the other was not intended to go into that fund.

It is urged by the respondent that the statute has stood since 1871 without attack or objection by the state and that this should be accepted as a practical construction by the state that the constitutional provision applied only to land, in accordance with the ancient signification of the word "escheat." We cannot assent to application of the doctrine of "practical construction" to legislative acts violative of the constitution. Practical construction of contracts by the parties, and practical construction by executive officers having to do with the enforcement of the statutes, are concededly entitled to great weight. But when property dedicated by the constitution to the school fund is diverted from that fund by the legislature or by officers administering a legislative act, this is a violation of the constitution which neither time nor good intentions can validate.

"Acquiescence for no length of time can legalize a clear usurpation of power, where the people have plainly expressed their will in the constitution and appointed judicial tribunals to enforce it. A power is frequently yielded to merely because it is claimed, and it may be exercised for a long period in violation of the constitutional prohibition without the mischief which the constitution was designed to guard against appearing, or without any one being sufficiently interested in the subject to raise the question; but these circumstances cannot be allowed to sanction a clear infraction of the constitution." Cooley, Const. Lim. (7th ed.) 106;

*Hamann v. Heekin,* 88 Ohio St. 207, 102 N. E. 730; *Terrell v. Middleton* (Tex. Civ. App.) 187 S. W. 367.

"Contemporary construction [of the constitution] can . . . never abrogate the text; it can never fritter away its obvious sense; it can never narrow down its true limitations; it can never enlarge its natural boundaries." Story, Constitution, § 407.

If this applies to a contemporary construction, with greater reason does it apply to a construction given twenty years later. "No length of usage can enlarge legislative power, and a wise constitutional provision should not be broken down by frequent violations." *People ex rel. Adsit v. Allen,* 42 N. Y. 378, 384.

It is also suggested that the legislature may waive the state's rights to state property. That it may do so as to property held in a mere proprietary capacity is doubtless true. But it may not waive the constitution of the state or the rights of the schools of the state to funds granted them by the constitution. The state does not take escheated property in a simple proprietary capacity. It takes such property as a trustee and holds it as trustee and it must keep faithful to its trust, and it is beyond the power of the legislature to divert its trust funds. "The school and university trust funds are high above the competency of the legislature to destructively assault them." *State ex rel. Owen v. Donald,* 160 Wis. 21, 68, 151 N. W. 331.

*By the Court.*—The order of the county court is reversed, with directions to dismiss the petition.